sr. at all. Arguments not to exceed 30 minutes to be shared by appellants. 30 minutes for Apple Lee, Ms. Obermeyer, Mr. Buccia, and Mr. Morris for appellants. Good afternoon. My name is Mark Buccia. I represent Anna Miller. We have divided our time between the three of us. I will be speaking for 8 minutes this afternoon. Then Mr. Morris on behalf of Levi Miller will be speaking for 5 minutes, followed by Ms. Obermeyer who will be speaking on behalf of Sam Mullett for 15 minutes, reserving 2 minutes for rebuttal. Sounds good. Your Honor, we're here today because the government's trying to salvage a conviction for conspiracy to obstruct justice against Anna Miller without any evidence to support that conviction. There's no evidence that any participants in the hair and beard let alone any intent to impede any government investigation or to obstruct justice. Was this issue raised in the prior appeal? Yes, Your Honor. We raised this in the prior appeal. The brief argued specifically in multiple places, including in the summary of the argument, in the argument itself, and in the point headings, that the only conspiracy that Anna Miller arguably joined was a conspiracy to cut hair. Was this focused on one attack or many attacks? How did that argument get developed? The argument was focused on the one attack with respect to Barbara and Marty Miller, which is the only attack that Anna Miller was alleged to have been involved in. Importantly, in pointing out in our brief that the only conspiracy that Anna Miller may have joined was a conspiracy to cut hair with respect to Barbara and Marty Miller, the government didn't respond by saying, what about the conspiracy to obstruct justice? That was not even mentioned in their brief at all. And the first time any mention of that came up with regard to Anna was after the conviction was reversed. You're referring to the last round of briefing or this round of briefing? In the last round of briefing, Your Honor, the issue... Why would it be their duty to talk about the conspiracy if it wasn't clear you'd raised it? Your Honor, our view is that it was clear that we raised it. We raised it by saying the only conspiracy that she may have entered was a conspiracy to cut hair. I'll get your brief out, I guess, from the initial appeal, but you argued insufficient evidence of a conspiracy to obstruct justice, and you have an argument section in your brief that you filed that I read that obviously didn't respond to, but it's in there? Your Honor, what's in that brief is the argument that the only conspiracy that Anna Miller may have been involved with was a conspiracy to cut hair. That's how it's phrased. It's phrased very clearly that way. And it's developed along those lines in several different places in the brief. If I quote the government's brief, you can see that she was present at two hair cuttings. The government contends that she also helped collect the hair that was brought back to Samuel Mullet's residence. That's not in dispute, is it? Your Honor, with respect to the first point, that would not be in dispute. Anna Miller was present at the hair cuttings of Barbara and Marty Miller, and she was present when the hair was collected. However, there is no evidence in the record to indicate that she herself collected the hair or that she brought the bag that the hair was put in or anything of that nature. It's true that she was present. She was also present when the bag was taken to Samuel Mullet. That is actually in dispute. There's two different witnesses, and in fact, one witness, Johnny Mast, when asked expressly to tell the court the people who were present that day, he does not list Anna Miller. How about the other witness, though? It only takes one, right? Well, the other witness doesn't give a list of who was and was not there. The other witness sort of speaks in generalities about who was there. But our view would be that even if she was present there when the hair was brought back, there's still no evidence of any intent to obstruct a government investigation. Even her being there, being there is not enough. There must be something else to show that she intended this. And there was no discussions before the hair cutting occurred about collecting the hair, bringing it back, and destroying it. And the first time that ever came up was when Samuel Mullet said it once the bag had been brought back. There was never any evidence before that of any discussions, especially with respect to Anna Miller, that she intended to destroy the bag of hair. And this is important, especially because of the way that the verdict forms here were given to the jury. The jury was asked to find a conspiracy with three objects, to commit a hate crime, to obstruct justice, and to make false statements. The jury found two of those objects, but the way that the forms were given to the jury, that was one form. And then they were asked for each defendant, whether that specific defendant joined that conspiracy. The jury was not given an opportunity to say that, for example, Anna Miller only joined a conspiracy to commit a hate crime, or only joined a conspiracy to obstruct justice. So once the jury found that there was a conspiracy to commit a hate crime and to obstruct justice, it was an all or nothing choice as to each defendant. The jury had to find either that each defendant committed a conspiracy with both objects, or no conspiracy at all. And we believe that was improper, and that was an improper use of the jury forms. Because then this court... What if we read your appellate brief the first time to say you were complaining about the sufficiency of the evidence with respect to a conspiracy to join multiple attacks? If that's how we read it, then what do we do? I'm not sure I understand your question exactly. So you're saying your argument today is there's not sufficient evidence to show that she committed a conspiracy to engage in one attack. And my recollection and my understanding of the first appeal is that's not what you argued. You argued about sufficiency of the evidence with respect to a conspiracy to engage in multiple attacks. Okay, so they're different arguments. And so I'm saying if that's how I end up reading your first brief and the first appeal, what do I do? Your Honor, first our position would be that that's not the way that we intended to argue. We were arguing there was only one conspiracy. Is that what it says, though? It says that there's only a conspiracy to cut hair. That's the only conspiracy that there is, and therefore no other conspiracy. But even if you did read it that way, we believe that it's plain error for the judge to have submitted to the jury a theory of the case for which there's no evidence to support it. And there's just no evidence in the record to support the conclusion that Anna Miller intended to obstruct justice or intended to join a conspiracy to obstruct justice in any way. It's all about how much or how little can an inference be drawn here. That's the issue, isn't it? So you've got somebody who participates in a hair cutting, at least is present when the hair is collected, and is present, according to one witness, when the hair is taken to the person the government identifies as the ringleader, who also is said to, in front of all these people, burn the hair, get rid of the camera. You could argue that some of this is just mere presence, which doesn't prove a conspiracy. But the first step, going to cut the hair, that's now somebody actively participating, isn't it? And can't the jury infer from that all the other steps? I don't think it can, Your Honor. I don't think the jury could say that her participation in cutting the hair means that she also intended to obstruct justice. Necessarily. But does it create a jury question is my question to you. I don't believe that's enough evidence. I think that what we have here is classic mere presence. And mere presence is not enough to prove a conspiracy. And Anna Miller did nothing more than she was present. She cut hair. There's nothing that she did or anything that she said that upon which a jury could infer that she intended to obstruct justice. There's just no evidence there. And I think that for that reason, the court should reverse the count one, the conspiracy count, in its entirety with respect to Anna Miller. And just one more thing about the jury verdict forms. The court gave an instruction to the jury that they could find a conspiracy so long as they found that any defendant, either one intended to, and I see my time is up. I just want to finish this point very briefly. Sure. Whether either defendant intended one to commit a hate crime or to obstruct justice or to make false statements, the jury forms made that impossible. The jury was not able to do that. So the judge gave an instruction to the jury that contradicted the forms that they had. And the forms were defective, and therefore the court should reverse the conspiracy count on that basis as well. There was an objection to the jury forms? Your Honor, there was not, but I believe that that would be plain error. Thank you. Thank you, Your Honor. Your Honor, may it please the Court, Joseph Morris on behalf of Levi Miller. As I was listening to my colleagues speak regarding sufficiency, because Mr. Miller, Levi, finds himself in a very similar situation, however, at a very high end or much higher end of the pool, I suppose, or of the latter as it relates to what his ultimate sentence was originally and then what it was ultimately reduced to at resentencing, regarding a sufficiency challenge to begin with. Mr. Miller was obviously individually found not guilty of obstructing justice. After this Court's original opinion in the first appeal, of which admittedly I was not involved, but nonetheless in review of that, one of the things that I just heard argued that made me hearken back to my original read of the Court's opinion was, in fact, there was no remedy or there was no direction or there was no mandate from the Court to the district court other than to retry the case. I find this really puzzling. Your client wants to be retried for the hate crime? The way in Mr. Miller's objective view here, Your Honor, is that all that he ever wanted was a full and fair trial regarding all of those charges. The way that ultimately the whole matter was dealt with, everything was so, for instance, the object of the conspiracy, as he sits before the Court... I'm just not understanding the answer. The prior opinion says the hate crime convictions fail because of a flawed instruction. The only way you're going to get a conviction for hate crime and an increased sentence for it is based on a new trial. That's not us telling them to do that, and more puzzling than anything is why your client would want that to have happened. I would have thought your client would be saying, nice work, thanks for convincing the government not to retry me on the hate crime, and just take it at that. Some people just can't accept victory. I mean, it's just like, what do you want? Well, and if in fact and upon request for clarification to this Court and ultimately from the government's en banc request that was denied as well, that would be certainly understandable. But the question that Mr. Miller has, or stands before the Court in wonder, is that regarding the original mandate of the Court, did this Court direct the district court to proceed to a resentencing, or did it direct the district court to, in fact, what the plain language seems to suggest, the remedy being a retrial of the matter, certainly at the government's election, which did not happen, the intervening event, this resentencing for which we're now here on, wherein... So your error is still as I thought it was, that there's been an error because your client was not retried, and he'd like to stay in jeopardy and like to have the new trial. Certainly I would never wish, nor would my client ever wish, to be subject to continued jeopardy or a hate crime potential, Your Honor. However, having said that, as an individual who was not interested in a plea negotiation or a plea bargain at some point, was seeking a full and fair trial, was seeking a trial, and certainly everyone... There's nothing more fair from a criminal defendant's perspective than an acquittal. And that's what we gave you. And you... This is... However he... Can't take yes for an answer. However he remains, he remains convicted within an interwoven conspiracy. No, but that goes back to whether those convictions were challenged. And if those convictions aren't challenged, that's just the way it goes. And as I had heard earlier, Judge Griffin questioned my colleague regarding challenges regarding sufficiency or things at that time, and certainly noting in the court's original opinion, there was an indication in that opinion, obviously, that the convictions for obstructing or falsification were not challenged. Defendants don't challenge other sources of conviction or counts other than the hate crime statute. However, as it relates to the... For instance, in Mr. Miller's case, the conspiracy for which he sits, there was no possibility for anything other than that original appeal to be challenging that, in fact, situation once it challenged the hate crime itself. The interrelatedness of that and the object of the conspiracy, and it becomes so disjointed for Mr. Miller, Levi, when it comes time for sentencing, because the question is, regarding that jury verdict form, as was stated earlier, became an all-or-nothing proposition. And once that hate crime is excised, that conspiracy to obstruct count that he remains with now, that he ultimately receives a statutory maximum sentence for, despite, frankly... Didn't he get a lower sentence? He received a... And this would, again, bring me, Your Honor, with all due respect, back to the inability to excise one from the other. When the district court originally sentenced him to 84 months, there was a... So now what is he, 69, 60-something? 60 months. Okay. There was a general proclamation amongst groupings of defendants that essentially went, as the court is well aware, you three gentlemen in this situation receive 84 months. Ultimately, when that was brought back, and there is no separation between was that at that time, was that 84 months relative to the hate crime conviction, which is now excised by the court? Was that... What was the separation amongst that sentence? And, again, this goes to the interrelated idea of all of that. The resentencing was not what the court... Well, I mean, the red light's been on for a little while, but maybe just to think about this point, and whoever's doing rebuttal, if you still think this argument's worth making, you can make it. But to the extent you're making a sentencing argument, of course the district court judge did not know exactly what part of the 80-plus-month sentence went to hate crime and what went to obstruction of justice, because at that point, both convictions were good, and the district court, of course, is allowed to act on that premise. And so that's what he did. On resentencing, he can't do that anymore, and so he imposed a sentence based on one. I don't know. That's what he's allowed to do. But anyway, maybe I'm missing something, and on rebuttal you can tell us what we're missing. Thank you. Great. Thank you. Ms. Overmyer. Good afternoon, Your Honors. May it please the court. I'm Wendy Overmyer on behalf of Sam Mullett. Excuse me, getting over a cold. Your Honors, this obstruction case is back before this panel because the district court imposed a kidnapping sentence and used an arbitrary percentage to impose a sentence of over 10 years for simple, nonviolent obstruction. Sam Mullett has been in custody for 53 months as of today, and he has another five years to go. He will be in prison until he is 75 years old under the current sentence. After this court vacated the underlying convictions in Miller, the government chose to immediately proceed to resentencing and not to retry the defendants on the hate crimes count. But they used the backdoor of sentencing. Are you happy with that decision, or do you complain about that as well? We were happy to have resentencing. And happy not to have a retrial on the hate crimes. Yes, very much so. Not happy about the relevant conduct, including the hate crime conduct. That's really a big part of the issue here, isn't it? The big part of the issue is not so much the hate crime conduct, the assaults. It's that the court found kidnapping. It's the kidnapping here that drove the guidelines up. The hate crime guideline by itself. The guideline you're referring to refers to kidnapping, something, and then unlawful restraint? The guideline refers to kidnapping, hostage-taking. And restraint. Presidential assassination. And some types of, I would say it's limited to kidnapping. Restraint is covered by a two-level enhancement over in 3A1.3. I thought the full name 2A4.1, maybe I've got it wrong, is Kidnapping, Abduction, Unlawful Restraint. Have I got it wrong? I don't have the title in front of me, so if that's what the guideline says, then that's what it says in front of you. But the guideline also allows a two-level enhancement. Why was this not unlawful restraint? What am I missing? This is not the type of restraint that's analogous to federal kidnapping. And that's what this court has said, starting with Epley in 1995, that if you cross-reference to the kidnapping guideline, it must be for a crime that's analogous to federal kidnapping, which is true kidnapping, not just restraint. The commentary, though, to 2H1.1 is limited. It says federal, state, or local. To the hate crime statute. Yes, the hate crime statute itself does have those words. The federal kidnapping guideline does not. The federal kidnapping guideline. The commentary does, though. The federal kidnapping guideline, I believe, refers to federal kidnapping and the types of federal kidnapping. He's asking about the commentary, not the guideline. It was my understanding that the federal kidnapping guideline did just refer to federal kidnapping in the commentary.  Let me take you to what's on mine, if you don't mind. I know I'm glossing over whether this has to have interstate aspiratation. That's your argument. But if we stayed with a state version of kidnapping, of course, that wouldn't be part of it. There are some crimes that involve some inherent moving of people, and then there's some that don't. In a lot of the cases over time, and this is something way back to my law school days a long time ago, that you normally, if you have a separate offense of kidnapping, it has to involve something extra. It can't be inherent, as you've argued. But here it seems that's the dilemma. Is the restraint inherent in a hate crime, or is the restraint on top of the hate crime in order to cut the beard? So there's a nuance here. That's exactly the issue. That's exactly the issue. And here it's been our position all along since the first briefing that this was just restraint incidental to an assault. There's often restraint involved with assault, whether someone's grabbing someone to keep them still or sitting on top of them while they're punching them or something of that. There was no restraint beyond what was necessary for some defendants to cut their hair. Some weren't restrained. Bad comparison. If I got you by the shirt and slapped you in the face, we probably would say that's not kidnapping. Would you agree? True. Yes, that's not kidnapping. For a brief second, I restrained. And that may be restraint. There is a two-level enhancement for physical forcible restraint, and that could apply here. But if I forcibly come in your house and intimidate you, that could be a hate crime by itself, as long as I've touched you, done some personal injury. But one argument would be, but now I put you on the floor and hold you while either I or other people cut your beard. That could be argued to be additional restraint. It gets us closer to kidnapping, doesn't it? I think it's the same as holding someone by the shirt to assault them. Here it was to hold the victim still, or some victims. Some victims were not held. It's to hold some victims still while they cut their hair, and then they were immediately released and either the defendants left or they remained and talked for a little while before they left of their own accord. So when you're looking at the difference, should this be two levels, physical restraint, or should this be 12 levels for kidnapping, I think you lean in favor of the defendants. I think you go, this should be two levels. So if we take obstruction plus two levels for restraint, and even including the two levels for elderly victim, vulnerable victim, and including a four-level for leadership role, which we disputed those, but for the sake of argument, if you add all those enhancements to obstruction, you come to 41 to 51 months. It's a 22, and he's a Category 1. And Sam has served 53 months in this case. So you have the obstruction guidelines, which take into account the obstruction conduct, and you have a restraint guideline that covers physical restraint, which happened here, but it was only restraint necessary for the offense itself. It wasn't kidnapping in the true traditional sense of kidnapping, which this court has. And a couple previous opinions from last year, the Judge Griffin wrote affirming the cross-reference to kidnapping was Anderson and Pago. And in those cases, one involved a 922G case, possession of a firearm. But while the defendant possessed the firearm, he went into a car with a child in the car with a gun pointed to the mother and said, get in this car and drive me to a different location. That was kidnapping. So the court allowed the cross-reference to the kidnapping guideline. That was separate than just possessing a weapon. In Pago, there was a confidential informant held at knife point in a hotel room for three days, beaten severely. That is true kidnapping. What's the relevance of the fact that quite a few state laws defining kidnapping cover restraint? Kidnapping laws are very broad at the state level, and Ohio has three different statutes that cover kidnapping. They go from kidnapping to what's entitled abduction, which actually doesn't require abduction, to unlawful restraint. And the difference between the three, it can go from an F-1 to a third-degree misdemeanor. So simple physical restraint by itself is a third-degree misdemeanor in Ohio. That's unlawful restraint. And that's under ORC 2905.03. So that's punishable by up to 60 days. The next level is abduction, which is restraining liberty to create the risk of physical harm or place a victim in fear. And that's an F-3. That's punishable by up to 18 months. And then Ohio has kidnapping, which can be an F-1 or an F-2. It's an F-2 if the victim is released safe. And that's restraining the liberty to terrorize, inflict serious harm, or creating a substantial risk of serious physical harm. Let me ask you a question. I must be missing something here. So the kidnapping guideline you keep referring to is a guideline that, as I understand it, says kidnapping, abduction, unlawful restraint. So it covers all three. And there's a definition of unlawful restraint that I think seems to apply to this fact pattern. And what I hear you be saying is, well, that's not fair. There's a physical restraint guideline we should use. And I guess my answer is why. If unlawful restraint applies here, unlawful restraint applies here. And I know the intuitions about kidnapping you're invoking. I have the same intuition. But what am I missing about reading the guideline? Forget the intuitions. If the guideline is inconsistent, I think it must be read in defendant's favor. And here the guidelines apply a two-level enhancement for forcible restraint. And then the kidnapping guideline, as this court said in Epley, is to be used for analogous crimes. It's a level 32 guideline. That's one of the highest guidelines. It's the same guideline for presidential assassination. And so it's an extremely high guideline. So to go up 12 here because it's... That just seems like a protest to the guideline. I mean, it just seems like disagreement. Why are you having such a significant disparity between unlawful restraint on the one hand and what's the other one, physical restraint? Physical restraint. Physical or forcible restraint. Okay. But that's just a disagreement with the Sentencing Commission. It is a disagreement, I think. And when the guideline... But I don't understand why that shows error by Judge Polster, who... That's why I'm not understanding what the error is. If the unlawful restraint guideline by its terms applies here, that's not a procedural reason, we'll say. It's entirely reasonable to apply it if it applies by its terms. I feel like I'm missing something, but I can't figure out what it is. It's an error. It inflates the guidelines here. And so if you have an inconsistency within the guidelines where it can lead to a two-level enhancement or a 12-level enhancement, that's a considerable inconsistency in the guideline. That has to be resolved in the defendant's favor. Otherwise, it's so substantively unreasonable to go up to a level that you punish presidential assassination and true kidnapping and hostage-taking for something that's just inherent to the offense itself when there is another guideline that can apply to that, when there is the 3A1.3 that can apply to that. And here, not only were the guidelines inflated, but then the court didn't even really follow any type of 3553 analysis or Rule 32 or consider any other factor other than Levi Miller and Johnny Mullet's statutory maximum sentence of 60 months. And this is going to the percentage usage that the court applied across the board. The court said, well, the guidelines don't really matter to me. I have to come down. It's just a question of how much. So the court took the 84-month sentence in post. We were happy with that. We were not happy with where the court came down to. No, no, but I mean the judgment that in one sense he was saying, I don't care what the guideline sentence is, right? I think it's too high. Well, the obstruction guideline is the guideline that should control here with those certain enhancements. That is the reasonable guideline. That's the starting point where the court should have started from. And then if the court wanted to go up from there, the court would have had to justify going up from there, not coming down from an inflated erroneous guideline. Let's go back to your math point because you were transitioning to the mathematical point. And quite often we get defendants coming to us saying it's not fair that the judge didn't pay attention to the relative guilt, harmfulness of what the different defendants did. So here was a judge who was trying to do that, which doesn't seem like a bad idea. I don't know that he had to do that. I think there are cases that say you don't have to do it. But I don't know of cases that say it's fair to do it. The court in this case did not discuss the individual obstructive conduct of different defendants. It imposed the same obstruction sentence for Johnny Mullet, who was not involved in obstruction, with Levi Miller, who was much more involved in the obstructive conduct in this case. And it assumed that they get the same thing, that 60 months statutory maximum was the correct sentence for both of them, instead of their properly calculated guideline range. And that's where it started from. A lot of these sentences, starting with Johnny Mullet, were one-fourth of what the guidelines were. So the statutory max, which becomes the guideline range in a technical sense, is still far, far below what the guidelines called for. The kidnapping guideline, which we argue is an error. It should be the obstruction guideline, which is far below the statutory maximum in the case. And then to come down from the 84-month sentence, which was unreasonable to begin with. Again, it was based on kidnapping when it should not have been. And say, well, they're limited to 60. That's 28%. I'm just going to apply that across the board. Without looking at individual mitigating factors, individual conduct and the offense conduct, and the national disparity it creates between this and other obstruction. Does the sentencing judge consider the individual factors at the time of the original sentences? There was very little said at the time of the original sentence and at this sentence as well. And that was raised in our original brief, the problems with the first sentencing. You mentioned national disparities. We're really looking at 3553A6, trying to avoid unwarranted sentence disparities. That's the part of 3553A that the district judge was focused on. And he was looking at the sentences in relative terms to each of the defendants. So the 28% issue was to make sure that factor of the sentencing considerations was satisfied, wasn't it? Well, 3553A6 addresses national disparity. It does, but there are lots of cases to talk about. It's not inappropriate in a conspiracy case, especially where you have multiple defendants, to try to put them in relative culpability levels and relative criminal history levels. No, that's certainly something that a court can consider, and we're not contesting that. We're saying the starting point was wrong. The starting point was wrong for Johnny Mullet. That seems like your real point. And it was wrong here for Sam Mullet. It's not as though the court can't give different sentences to different defendants. It's the starting point. Yes, that's not the case. It's just that here the starting point was wrong. The guidelines it calculated was wrong. The starting point of Johnny Mullet and Levi Miller's statutory maximum was wrong. And then the court didn't listen or address individual factors. It didn't discuss national disparity with civil rights cases, which have a national average of 43 months, three times less. The national average for obstruction cases is 23 months. This sentence is five times higher, where it's nonviolent. You wanted him to do a little more math. What's that? You wanted him to do a little more math, it sounds like. The math that's required under 3553A, which is national disparity. Well, we can disagree. When you see a number of 43 months, you have to know what kind of cases we're talking about. This could be the unusual case. And comparing that to a typical case may be completely out of bounds. This is an unusual case. And this case is far less violent, frankly, than the recent civil rights and obstruction cases before this circuit and other circuits. From an observer's standpoint, they run the whole range. You wouldn't be able to pin down particular cases by looking at an abstract national number from a sentencing commission. Well, you can look. I think you can look at cases where this court has recently approved obstruction sentences where witnesses were intimidated, where death threats were made to confidential informants, and they're getting three-, four-year sentences. And here we have nonviolent, minor obstruction conduct that actually preserved evidence. It did not hinder the prosecution. And he has a sentence of over ten years, which is beyond the hate crimes statutory maximum, which is ten. And so I think the sentence is both procedurally and substantively unreasonable. It's funny in this case. It's a conviction that stuck. The jury found kidnapping. There was a sentencing enhancement. Well, we wholly disagree with the definition used there and believe that does not qualify under the hate crime statute. Okay, thank you. Here from the government. May it please the Court. Christine Khoo on behalf of the United States. Before I begin my arguments, I wanted to clarify a few points that my friend made here regarding the starting point, Your Honor. She claims that the obstruction guideline did not control here, and actually it did. The nature of obstruction, how it works, it leads you directly back to the underlying offense. So this conduct did not actually come in as relevant conduct, Your Honor. It came in directly under the obstruction guidelines, which requires you to consider the seriousness of the crime being investigated that's obstructed. And here the district court found that the crimes were serious, that he recalled the haunting testimony of the victims, and that the method of attack was particularly calculated to maximize the infliction of trauma and terror. And in that case, the district court determined that substantial sentences were warranted for the defendants. Isn't it a little strange that you get to use the hate crime guideline? I mean, that factored into the analysis, even though there's no hate crime conviction anymore? Well, Your Honor, the nature of obstruction does not occur in a vacuum. You have to consider what crime is being investigated that's being obstructed. And the seriousness of the crime being investigated factors into the relevant sentence for obstruction, Your Honor. And in this case, Section 249 expressly provides for a sentencing enhancement based on kidnapping. And the district court applied the correct definition in this case. And the jury and the district court independently found that there was sufficient evidence that the underlying conduct met the definition of kidnapping. And so that finding was not clearly erroneous. So it was appropriate for the district court to apply the kidnapping guidelines. So when they get to the guideline as opposed to jury instructions, why do we care whether it's kidnapping versus unlawful restraint? Because it's the same guideline that covers that and abduction, right? Am I missing something? Right. It could be called kidnapping or unlawful restraint. As Your Honor mentioned, the guideline title actually says kidnapping, abduction, or unlawful restraint. And it tells you to look at what relevant statutory basis there is for that guideline. And here, Section 249 provides that, Your Honor. There's a specific statutory enhancement for kidnapping. But just to be conceptually clear, there's a cross-reverence that takes us to this. Yes, Your Honor. And that's one way that this comes into the mix, that being the hate crime issue, the underlying substance of offense, for which there is no conviction now. But it could also be unconvicted conduct and becoming underrelevant conduct. Yes, Your Honor. And this court has recognized that even when there is, in U.S. v. White, this court affirmed a conviction that considered acquitted conduct, Your Honor. There wasn't even a conviction there. And here, this court was well within its discretion in considering the underlying assaults here and the seriousness here. Well, Your Honor, the district court here. That seems to back off the seriousness point. The seriousness of the crime did not affect what the government's decision to retry it, Your Honor. The government decided not to retry it because it was considering the victims and the impact it would have on them. It was a substantial burden on the victims here who were Amish to hire cars and travel back and forth to trial. And as the district court heard in the testimony, they were recalling traumatic experiences. And it was well within the government's prosecutorial discretion not to retry before sentencing. And the district court did not abuse its discretion in deciding to resentence the defendants before any retrial. And as Your Honors recognize at the last argument, the defendants were not challenging their obstruction or false statement-related convictions. And so they would have to have been resentenced on these other remaining counts. But the grind in a practical sense, and it's not my favorite guideline, is that we have, in essence, unconvicted conduct being used to drive the sentence. Yes, Your Honor. And actually, in U.S. v. James, this court recognized that it may be troubling to some that guidelines cross-references can effectively result in enhanced sentences for enough different offense, but they recognize that that is the law of this circuit. And so the district court here was well within its discretion in imposing the below guideline sentence that it did here. And it adequately explained the reason for those sentences was based on the comparative culpability of each defendant. It recalled the carefully constructed sentencing groupings from the first sentencing and determined that those sentencing groupings were still appropriate after it had considered all the filings and motions, listened to all the counsel's arguments, and then determined that those culpability groupings still were appropriate here. One thing that hasn't been raised too much by the appellants in their opening argument, although I guess a little by Anna Miller, is these arguments about challenges to the obstruction conviction, some of which were not raised the first time. And as I understand the government's position, it's, well, if they weren't raised then, I guess you're treating it like waiver. That's the end of the story. There's no authority of the Court of Appeals to review them now. And I guess I would have thought, and I'm really looking for guidance, I would have thought that, no, there is discretion. It's either a forfeiture-type situation where if it's a sufficiently plain, outrageous error, we could still correct it, or it's like law of the case where law of the case usually let things sit, but, again, there's even discretion in that doctrine from time to time to correct a massive injustice. Do you think it's one or the other, or do you say, no, it's neither? Well, I would say actually it's neither, Your Honor. We would say because there was already a first appeal here. But how is it waiver? Waiver is the knowing voluntary relinquishment of a right. We don't know that that's why they did what they did. It could have been strategic. It could have been a lot of things. Well, Your Honor, in our view, it was actually beyond forfeiture, Your Honor, because in the first appeal they had the opportunity to raise it. And this Court recognized that by not raising it in the first appeal. Because it's more than forfeiture doesn't make it waiver. Well, this Court actually recognized a waiver doctrine, Your Honor. As Judge Griffin recognized in Traxler, the waiver doctrine applies if the argument is not raised in the first appeal because it discourages perpetual litigation and promotes finality.  I think I can find about five cases for each of the three possibilities. So I'm looking for the most sensible way to think about it. And I have a very powerful intuition that in this setting, this case, there really still is authority. I mean, for example, where they're intervening law, which didn't help you so much the last time, but where they're intervening law, it's really hard to imagine we would not, you know, just completely changing the way obstruction cases work. It seems hard to imagine we wouldn't have authority to look at that if it met the other requirements of plain air or law of the case. Well, Your Honor, if there was intervening authority, I think that would change the circumstances of this case. Intervening law has, in a waiver setting, intervening law means nothing. Right. If you waive, it's over, no matter what happens. So that proves it's not waiver. Well, Your Honor, we, in this case, there was no intervening law. I know, but I'm asking a hypothetical to try to figure this out. So we've taken care of waiver. It's not waiver. It must be. We have two left. Well, in terms of forfeiture and waiver, this court would have discretion to still reach that issue, Your Honor. And we're not saying the court does not have discretion to reach that issue here. We're saying the court should, under its own waiver doctrine, determine that the argument was waived. Obviously, the court has the discretion to decide whatever it would deem appropriate here. But we are arguing that waiver applies even more strongly here because the defendants failed to raise this argument when they had the opportunity to do so in the first appeal. And because of that, basically the principle here is that it promotes finality and prevents people from getting two bites of the apple, Your Honor, because they had the opportunity to litigate this in the first appeal and they chose not to do so. Whether it was for strategic reasons or not, it was still a choice on their part whether to raise that issue and they chose not to do so. And in any event, we don't think that that's true. What do you say about Anna Miller's argument that she did raise it? Well, Your Honor, respectfully, we disagree. We don't think they raised it. In their first, as Judge Griffin recognized, in their first briefings, they did not have any arguments related to their conspiracy to obstruct justice conviction. Your Honor, they only put all of their arguments toward challenging their conviction for their Section 249 assaults. There was no evidence that they highlighted or any arguments that they pointed to that indicated that they argued that their conspiracy to obstruct justice lacked sufficient evidence, Your Honor. So in that circumstance, we believe that they had waived. And in any event, we just want to correct or clarify some of the assertions made by our friend here. There was sufficient evidence in the record to show that Ms. Miller participated in the conspiracy to obstruct justice. I think he had previously mentioned that there was no evidence that Ms. Miller was present when they presented the evidence to Mr. Mullett of the hair and the prayer cap. But on page IDs 6647 and 6649, Barbara Yoder expressly testified that Ms. Miller was there when the bag was presented and then testified that Mr. Mullett then directed the bag to be taken and burned. So on the standard of review here – Let's drill down on that for a moment. Pardon? Let's just drill down on that for a moment. Oh, sure. So she's present during the haircutting of two people. And then she is there when the hair is collected and taken back to Samuel Mullett. And then she's there, according to this witness, crediting that testimony, when Mullett directs that the hair be discarded, and that could be an act of obstruction, I assume. Beyond her presence, though, what else is there? Well, it wasn't mere presence, Your Honor, because this was kindly part of this single assault where she participated in the cutting of Barbara Miller's hair, participated in gathering up the evidence for the purpose of taking it back to their leader to show that the assault had taken place, and she was there actively. Right. Up to that point, that would show conspiracy to commit a hate crime. Yes, Your Honor. Now we've got to get from that to obstruction of an investigation of a hate crime. So how do we get to that next step? Well, she was there when the bag was directed to be burned, and she didn't stop it, and she was part of that common criminal enterprise, as a jury found, to obstruct justice. She didn't intervene to stop them, and she was part of the group that actually collected the evidence. And so there was an active participation on her part. And in any event, Your Honor— This is what I'm having a hard time with. Sure. Active participation if we were looking at a hate crime and a conspiracy to commit a hate crime. But it's a conspiracy to obstruct the investigation of a hate crime. And it seems to me where at least a lot of this evidence says you were there. And a jury, in some cases, if there's other evidence to go with it, could infer you're part of a conspiracy. But the standard instruction says mere presence isn't enough to be part of a conspiracy. Well, it wasn't mere presence. She was part of the group that actually collected the evidence. She was actively part of the group that cut Barbara Miller's hair, cut her prayer cap, put it in a bag in order to present it to their leader as evidence that it had happened. But the logical one from that is you could prove that the hair was cut. Yeah, proving that we did what you asked. Well, the case law of the circuit shows that the defendant's connection— once a conspiracy has been found, and here there was a single conspiracy with two objects, the defendant's connection can be slight. And moreover, the overt act of one co-conspirator is attributable to all. So under the case law of the circuit, it doesn't matter whether there was evidence of her actively even burning the bag. The fact that her co-conspirators were involved in obstructing justice and that she was connected to the conspiracy makes her still liable for conspiring to obstruct justice. And moreover, Your Honor, as I previously mentioned, this argument is waived, and the evidence supports this conviction, and the sentence that the district court imposed here for Anna Miller was 12 months and one day was reasonable. The district court acted well within its discretion in imposing the sentences that it did based on the comparable culpability of each defendant. Your Honor, this court has recognized that district courts have broad discretion in sentencing, and this case really boils down to one of sentencing, as defendants have argued. I think the district court here followed the guidance of this court in really looking at the relevant underlying conduct and then conducting an individualized assessment, and then determining based on the facts of this case that a below-guideline sentence was appropriate. And Your Honor, I also wanted to clarify that the defendants here all remain convicted of an obstruction-related offense, and all the defendants except Mr. Miller have completed their prison terms. And at least for four defendants, that's Anna Miller, Catherine Miller, Emma Miller, and Lovina Miller, Your Honor, they've completed their terms of supervised release. So at least for those defendants, any sentencing challenges that they raise are moot, and then two defendants are expected to complete their supervised release in May and June of this year. But in any event, Your Honor, the district court did what it was supposed to do here. It acted well within its broad discretion, and as Your Honor recognized, it really did look at the facts of this case and consider and recall testimony from trial and determine that substantial sentences were warranted for eight of the defendants who had not completed their prison terms. For eight of the other defendants, the judge had imposed time served. So the bottom line here is that the district court followed the proper procedures and imposed below-guideline sentences, and any suggestion otherwise is belied by the facts and law of this case. So if there's not any other questions, the government rests on a recess to the other arguments, and we ask that this court affirm. All right. Thank you very much, Ms. Koo. Ms. Overmyer, who's doing the rebuttal? Okay. Thank you, Your Honors. My first point I wanted to make is that it was our argument that the obstruction guideline controls. That's where the parties agreed. We start with 2J1.2, and we end with 2J1.2. Because the crime here being investigated was not kidnapping. The crime here being investigated was assault. And the assault guidelines are lower than the obstruction guideline in this case, and so the obstruction guideline controls. Again, with three disputed enhancements, it results in a range less than what Sam Mullett has already served. He has five more years to go for this obstruction sentence. And the government said that it chose not to retry based on the stress it would create on the victims. And while that might have partly factored in, their decision not to retry they laid out in their sentencing memo, which was before their motion to dismiss. They said, we will consider the lengths of these conspiracy and obstruction sentences in exercising our prosecutorial discretion, whether to retry the hate crimes. In other words, give us the same sentence and we won't retry. They didn't get the same sentence. But they didn't get the same sentence, but they still got over the statutory maximum for a hate crime, which is 120 months without kidnapping. And well above the obstruction guideline. It was the only potential conviction. That's a little misleading given the obstruction convictions. Yes, the obstruction does have a higher statutory maximum of 240. But again, you look at the obstruction conduct here, which is nonviolent conduct. It is very minor obstruction conduct. It involved Sam prohibiting a camera from being destroyed, saying, I'm not going to destroy it. Let's keep it. The camera was in Eli Miller's bedroom when the FBI raided the compound and arrested Eli Miller. And they didn't find it. They knew it was there. They knew it was in his bedroom. And they didn't search. They didn't find the camera. And it was after that point that Linda, I believe Eli's called Linda, who told Lavina to tell Linda. And there was a whole chain of command down to Johnny Mast eventually who decided to bury the camera. No one told him to bury the camera. No one told him where to put the camera. And again, the camera was found. It was turned over before trial. The pictures were used at trial. So this was an attempt at obstruction that failed. And the false statements made by Sam to the FBI was one false statement made after his arrest in this case. So again, yes, there was obstructive conduct, and we're not challenging the sufficiency of the evidence. But when you look compared to other cases, compared to the range of conduct that can fall under obstruction, this did not involve witness intimidation. This did not involve violence in any way. And it didn't end up hindering the prosecution in this matter. So for this court to leave Sam with a sentence of over 10 years for obstructive conduct is procedurally and substantively unreasonable. And I wanted to say quickly that the sentencing issues in this case remain relevant only if this court disagrees with our first claim in the brief, which goes to the constitutionality of the leftover obstruction convictions, which we do not waive. We just didn't raise that in argument today. So we ask this court to vacate counts 1, 8, and 10 as a result of federal overreach, and in the alternative, to vacate the sentences as procedurally and substantively unreasonable. Okay. Thanks to all four of you for your arguments. We really appreciate the briefs and oral arguments. I see, Mr. Morse, that you're court appointing counsel. We appreciate that. And thank you so much for your help on this difficult case. We'll work through it. And the case will be submitted.